IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

JUSTIN MOHR,

    Plaintiff,

vs.

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY,

    Defendant.

No. C09-1053

RULING ON MOTION FOR
SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    *INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  *RELEVANT FACTS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.*   *Events of November 17, 2007.* . . . . . . . . . . . . . . . . . . 2
    *B.*   *Insurance Coverages.* . . . . . . . . . . . . . . . . . . . . . 6

IV.  *LEGAL STANDARD.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.   *DISCUSSION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    *A.*   *Was Aaron "Using" the Pickup Truck at the Time
        of the Accident?.* . . . . . . . . . . . . . . . . . . . . . . . . 8
    *B.*   *Did the Accident "Arise Out of" Aaron's Use of the
        Pickup Truck?.* . . . . . . . . . . . . . . . . . . . . . . . . . 9

VI.  *ORDER.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## I. INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment (docket number 18) filed by the Defendant on September 24, 2010, the Resistance (docket

number 20) filed by the Plaintiff on October 15, 2010, and the Reply (docket number 21) filed by the Defendant on October 25, 2010. Pursuant to Local Rule 7.c, the motion will be decided without oral argument.

## II. PROCEDURAL HISTORY

This case was commenced on November 12, 2009, with the filing of a petition in the Iowa District Court for Jackson County. Plaintiff Justin Mohr ("Mohr") asserts that he is entitled to judgment against Defendant State Farm Mutual Automobile Insurance Company ("State Farm") pursuant to the underinsured motorist provisions of his insurance policy. On December 8, 2009, State Farm removed the action to the United States District Court for the Northern District of Iowa. State Farm filed its answer in federal court on December 14, 2009.

On March 18, 2010, the Court adopted a proposed Scheduling Order and Discovery Plan submitted by the parties.[1] A jury trial is scheduled to begin on April 18, 2011.

On September 24, 2010, State Farm timely filed the instant motion for summary judgment. State Farm asserts that there are no genuine issues of material fact in dispute, and that it is entitled to judgment as a matter of law. Mohr filed his resistance to the motion on October 15, 2010, asking that the motion for summary judgment be denied. Mohr asks that the Court find, as a matter of law, that "the accidental shooting of Plaintiff arose out of the use of the motor vehicle."

## III. RELEVANT FACTS

### A. Events of November 17, 2007

On November 17, 2007, Aaron Scott ("Aaron"), age 26, lived on a farm near Wyoming, Iowa. On that morning, Aaron argued with his father because Aaron smelled like alcohol when he showed up for work at the family farm. Aaron drove his pickup

---

[1] Also at that time, this case was referred to the undersigned Magistrate Judge for all further proceedings, in accordance with 28 U.S.C. § 636(c) and the consent of the parties.

truck to a local bar and started drinking whiskey at around 8:00 a.m. He had "quite a few" drinks, staying at the bar for a couple of hours. When Aaron drove back to the family farm at midday, he got into another argument with his father, and then promptly returned to the local bar.

Next, Aaron drove himself to the Quarter Deck, a bar in Baldwin, Iowa. There, Aaron drank alone, consuming "a lot" of whiskey drinks. Aaron returned to the Quarter Deck by mid-afternoon. He consumed whiskey drinks "continuously" for several more hours. By late afternoon, Aaron was drinking whiskey at a different bar with a friend. The parties agree that Aaron should not have been driving.

Around 8:00 p.m., Aaron made it back to the Quarter Deck in Baldwin. He drank "quite a few" more whiskey drinks. Aaron was depressed, angry, and felt he needed to "get drunk" to fix his problems. Aaron's girlfriend at the time, Tara Yaddof ("Tara"), met him at the Quarter Deck bar. When it became clear that Aaron was too intoxicated to remain at the bar – around 9:30 p.m. – Tara and Aaron left for Aaron's farm. At that time, Aaron was "very obviously" drunk, "stumbling," and "reeked" of alcohol.

Back at the farm and still arguing, Aaron jumped in his pickup truck and drove down the road in a rage. Aaron returned to the farm after the short drive. Tara told Aaron to go to bed and left the farm at approximately 10:00 p.m. When Tara left the farm, Aaron was sitting in his pickup truck with the driver's door open.[2] Sitting alone and intoxicated in his pickup truck, Aaron contemplated shooting himself.

Meanwhile, early in the evening of November 17, 2008, Plaintiff Justin Mohr met up with his friend, Brock Bowman ("Brock"), age 26. Brock is Aaron's cousin. At some point, Brock received a phone call from Aaron's father, Steve Scott, who informed Brock that Aaron was distressed. Brock understood that Aaron had been drinking heavily.

---

[2] In his response, Mohr asserts that there is "conflicting testimony on whether and when the driver's side door of Aaron's [sic] Scott's vehicle was open." Mohr states further, however, that "the disputed evidence is not of a material fact, and for purposes of this motion, Plaintiff does not dispute it."

3

Cody Coakley ("Cody"), age 27, joined Mohr and Brock. Brock, Mohr, and Cody went to a local bar and then to Aaron's farm to search for Aaron. They did not find him. Around 9:30 p.m., Miranda Wahl ("Miranda") and Tyler Braswell ("Tyler") joined the group. Then, Brock received at least one phone call from Aaron. "Basically, Aaron conveyed to Brock that he was suicidal."[3]

Back at the farm, Aaron was alone in his truck, which was parked in the yard.[4] The truck was running, but it was not in gear, the headlights were not on, and Aaron was not "planning on driving anywhere."[5] In his response, Mohr asserts that "[t]here is no evidence or testimony that Aaron Scott had made an affirmative decision that he was not going to go somewhere else, either to commit suicide or to consider it further." In his deposition, however, Aaron denied that he was "planning on driving anywhere" at that time.

Aaron regularly carried one or more firearms, and ammunition for them, in his truck, and regularly used those firearms to kill varmints on the farm as part of pest control,

---

[3] According to Mohr's response, this fact is undisputed for purposes of the motion for summary judgment. Mohr asserts, however, that "[a] more fair characterization of the testimony . . . is that Aaron Scott's discussion with Brock Bowman scared Mr. Bowman and gave him the impression that Aaron Scott might hurt himself."

[4] In his response, Mohr asserts that this allegation is disputed. A review of Aaron's deposition reflects, however, that Aaron was, in fact, sitting by himself in the truck which was parked in the yard.

[5] State Farm disputes whether the engine of the pickup truck was running at the time of the shooting "as a matter of fact." When Tara left the farm earlier, she took Aaron's keys. Aaron testified in his deposition, however, that he "walked back to the fuel cap," and retrieved his spare keys. According to Aaron, "I believe the truck was running." When asked later about the same issue, Aaron testified "I'm assuming it still was, because I don't remember shutting it off." Justin Mohr and Brock Bowman testified that they could not remember whether the truck was running or not. In any event, for purposes of the motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. Accordingly, for purposes of the motion, the Court assumes that the truck was running.

4

while he was using the truck and for hunting and trapping game animals. It is undisputed, however, that Aaron was not hunting or trapping at the time of this accident. Aaron recalls loading the gun with ammunition. State Farm asserts that Aaron "was in his pickup truck to kill himself." Mohr responds, however, that "[t]here is no testimony or other evidence that Aaron Scott entered his vehicle for the purpose of killing himself." Mohr further asserts that Aaron had plans to use the truck, if necessary, to "get away from" Mohr and Brock.[6] State Farm further asserts that "this" was not a "normal use" of the pickup truck. Mohr responds that there is no evidence in the record "as to the frequency with which motor vehicles are the site of attempted or successful suicides."

Plaintiff Justin Mohr, Brock, Cody, Miranda, and Tyler drove to Aaron's farmhouse in Cody's truck and arrived at approximately 10:00 p.m. "They knew that something was wrong." When they arrived, Cody parked near Aaron's pickup truck. It was cold and dark, but the headlights on Cody's vehicle revealed Aaron sitting alone in his pickup truck. Cody and Brock approached Aaron first. Cody opened Aaron's driver's side door and began to talk to Aaron. Mohr then joined Cody and Brock outside the driver's side door of Aaron's pickup truck. Mohr "sensed that the situation was nervous, but felt he should try to talk to Aaron." Aaron was clearly intoxicated, upset, and holding a handgun. Aaron occasionally waived the gun. Miranda and Tyler never left Cody's car. In fact, Cody, Miranda, and Tyler eventually left the scene and were not present at the time that Mohr was shot.

---

[6] In his deposition, Aaron testified as follows:
    Q.    When they arrived, did you have any plans to put the truck in gear and drive somewhere?
    A.    If I had to get away from them so they wouldn't stop me.
    Q.    Was that your plan to get away from them?
    A.    If I had to, yeah.
*See* Aaron Scott Deposition, 32:1-6 (State Farm App. at 32).

Mohr and Brock remained at the farm to deal with Aaron. Mohr and Brock tried to talk Aaron out of committing suicide as they stood beside Aaron's pickup truck. Brock was standing inside Aaron's opened driver's side door, and Justin was standing in front of the door, closer to the front of the truck. Aaron continued to talk about shooting himself, asking Mohr and Brock to leave or turn away. Aaron raised the handgun toward his head and told Brock to turn his head.

Brock reached for the gun to get it away from Aaron. A brief struggle for the gun ensued. During the struggle, the handgun accidentally discharged. The bullet from the handgun struck Mohr. Mohr was rushed to the Maquoketa hospital and then flown by helicopter to the University of Iowa Hospitals and Clinics, where he underwent emergency surgery. The gunshot wound caused Mohr permanent injuries.

## B. *Insurance Coverages*

At the time of the accident, Plaintiff Justin Mohr was an insured under a policy issued by Defendant State Farm Mutual Automobile Insurance Company. The State Farm policy provided Mohr with certain uninsured motorist coverage. Aaron Scott was uninsured by automobile insurance at the time of the incident. However, Aaron was insured by Grinnell Mutual Reinsurance Company through a homeowner's policy at the time of the incident. The policy issued by Grinnell Mutual provided general liability coverage for "bodily injury." However, the policy issued by Grinnell Mutual excluded coverage for bodily injury "arising out of the ownership, maintenance, loading or unloading, entrustment or use of . . . any 'motor vehicle'."[7] On October 16, 2009, prior to filing the instant suit against State Farm, Mohr accepted the liability limits of the Grinnell Mutual policy – $500,000 – in exchange for a release of all claims against Grinnell Mutual.

---

[7] In his response, Mohr states that the allegation is "disputed," but in fact it would appear that Mohr simply disputes the legal significance of the policy issued by Grinnell Mutual.

6

## IV. LEGAL STANDARD

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party.'" *Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 821 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson*, 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears the initial responsibility of informing the court of the basis for its motion, and must identify those portions of the record which it contends show a lack of a genuine issue of material fact. *Heisler v. Metropolitan Council*, 339 F.3d 622, 631 (8th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (same). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see, e.g., Baum v. Helget Gas Products, Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

7

## V. DISCUSSION

The insurance policy issued by State Farm provides, in relevant part, as follows

> We will pay damages for *bodily injury* an *insured* is legally entitled to collect from the owner of a driver of an *uninsured motor vehicle*. The *bodily injury* must be caused by accident arising out of the operation, maintenance or use of an *uninsured motor vehicle*.

*See* State Farm's Appendix, Exhibit J.

The parties agree that (1) Justin Mohr is "an insured," (2) Aaron Scott was the owner of "an uninsured motor vehicle," and (3) Mohr suffered a "bodily injury [] caused by accident." The fighting issue, however, is whether Mohr's injuries arose out of the operation, maintenance or use of the vehicle. Accordingly, the Court must determine (1) whether Aaron was "using" the truck at the time of the accident and, if so, (2) whether the accident "arose out of" such use.[8]

### A. Was Aaron "Using" the Pickup Truck at the Time of the Accident?

First, State Farm briefly argues that the pickup truck was not being "used" at the time of the accident. Neither the insurance policy, nor Iowa Code section 516A.1 (upon which the uninsured motorist policy is based), define the term "use." In this context, the Court believes that the term "use" has a broad meaning. *Tolleson v. State Farm Fire and Cas. Co.*, 449 So.2d 105, 108 (La. App. 1984) ("It is well established that one need not be actually operating or driving a vehicle in order to be using it."). Here, Aaron had driven back to the farm and was parked in the yard. The truck was running, but it was not in gear and the headlights were not on. Sitting alone and intoxicated in his pickup truck, Aaron was contemplating shooting himself. In the broadest sense, the Court concludes that Aaron was "using" his truck when the accident occurred.

---

[8] Mohr apparently concedes that the accident did not arise out of Aaron's "operation" or "maintenance" of the vehicle.

### B. Did the Accident "Arise Out of" Aaron's Use of the Pickup Truck?

The real fighting issue is whether Aaron's accidental shooting of Mohr "arose out of" his use of the pickup truck. State Farm argues that the truck was the "mere situs" of the accident, and the shooting was unrelated to the "inherent nature" of the motor vehicle.

Both sides cite the Iowa Supreme Court case of *Hollingsworth v. Schminkey*, 553 N.W.2d 591 (Iowa 1996). There, Schminkey was overcome by carbon monoxide fumes after pulling his vehicle into his garage. "[A]fter the station wagon struck the corner of the garage, 'the vehicle remained running, the left rear tire of the vehicle had spun until it caught fire, engulfing the vehicle and the garage.'" *Id.* at 594. The plaintiff, Hollingsworth, was driving by the Schminkey residence when he observed smoke coming from the rear of the residence. After stopping to investigate, Hollingsworth discovered Schminkey in the front seat of the station wagon, slumped over the steering wheel. With some difficulty, Hollingsworth and a third person removed Schminkey from the vehicle and carried him toward the rear of the residence. In the process, Hollingsworth injured his back. Hollingsworth sued his insurance company, State Farm, under the uninsured motor vehicle coverage provided in his car policy. The policy term was identical to that in the instant action.

Initially, the Iowa Supreme Court noted that "the words 'arising out of' are given a broad, general, and comprehensive meaning." *Id.* at 595 (citing *Kalell v. Mutual Fire & Auto. Ins. Co.*, 471 N.W.2d 865, 867 (Iowa 1991)).

> "The words are commonly understood to mean originating from, growing out of, or flowing from, and require only that there be some causal relationship between injury and risk for which coverage is provided." A policy provision covering injury "arising out of the use of the vehicle" conveys a more liberal concept of causation than "proximate cause" in its traditional legal sense.

*Id.* at 595 (quoting *Kalell*, 471 N.W.2d at 867; and citing *Dairyland Ins. Co. v. Concrete Prods. Co.*, 203 N.W.2d 558, 561 (Iowa 1973)).

9

The Court also cautioned, however, that while the phrase is broader than "proximate cause," it requires something more than the vehicle simply being the location of the accident.

> Although the phrase imports a concept of causation, the words are of much broader significance than "caused by." However, "the mere fact that an automobile is the situs of the accident is insufficient to establish the necessary nexus between the use and the accident to warrant the conclusion that the accident arose out of such use."

*Id.* at 595-96 (quoting 7 Am. Jur. 2d *Automobile Insurance* § 194, at 700, 704 (1980)).

In *Hollingsworth*, the Court concluded that there was a genuine issue for trial, which precluded entry of summary judgment for the insurance company. The Court described the facts from which a jury could find that the accident arose out of the operation, maintenance, or use of Schminkey's uninsured vehicle:

> Schminkey used his uninsured station wagon after learning the exhaust system had been damaged and carbon monoxide was being emptied into the passenger area. He became asphyxiated while driving the vehicle into his garage. The motor continued to run after the vehicle hit the corner of the garage. The tires continued to rotate until they became so hot they generated smoke and then a fire. Hollingsworth was injured while removing Schminkey from the burning station wagon.

*Id.* at 596.

The Court believes, however, that the facts in *Hollingsworth* are distinguishable from the facts in the instant action. In *Hollingsworth*, the operation and maintenance of the vehicle were an integral part of the circumstances leading to the plaintiff's injury. Schminkey's continued operation of the vehicle after learning that the exhaust system was not operating properly, the motor continuing to run after Schminkey pulled into his garage, and the tires continuing to turn – thereby starting the fire which attracted the plaintiff's attention – all directly contributed to the circumstances leading up to the injury. In the instant action, however, the pickup truck played no part in the accidental shooting. The

fact that Aaron was sitting in the vehicle, or that the motor was running, is incidental to the struggle which resulted in Mohr being shot. Stated otherwise, there is no "causal relationship between injury and risk for which coverage is provided." *Hollingsworth*, 553 N.W.2d at 595; *Kalell*, 471 N.W.2d at 867.

This conclusion is supported by numerous jurisdictions which have addressed similar circumstances. In *Cameron Mut. Ins. Co. v. Ward*, 599 S.W.2d 13 (Mo. App. 1980), the Court described "five principal categories" of cases involving the accidental discharge of a weapon in or near a vehicle. The first category described by the Court in *Cameron* are those cases "involving the accidental discharge of guns inside moving or motionless vehicles while an occupant of the vehicle is handling or toying with the gun."[9] *Id.* at 15. Identifying 11 cases, the Court in *Cameron Mut.* found that authorities unanimously rejected coverage under those circumstances falling within the first category.

> Without exception, these cases hold that no coverage exists under the insuring agreements of the respective automobile liability policies involved because there was no causal connection between the discharge of the guns and the use of the vehicles; at best, the vehicles were merely the "situs" or "locus" of any resultant injuries as discharge of the guns was unconnected with the inherent use of the vehicles.

*Id.* See also *Criterion Ins. Co. v. Velthouse*, 751 P.2d 1, 4 (Alaska 1986) (no coverage when the victim was accidentally shot by another who was "horsing around").

---

[9] The second category are those cases "involving the accidental discharge of guns during the process of loading them or unloading them from vehicles." The third category involves "the use of a physical portion of a vehicle as a 'gun rest' for the purpose of firing a weapon." The fourth category are those cases "involving the accidental discharge of guns resting in or being removed from gun racks permanently attached to vehicles." The fifth category are cases involving "the accidental discharge of guns inside a vehicle caused by the actual movement or operation of the vehicle." *See Cameron Mut.*, 599 S.W.2d at 15-16.

11

In resisting State Farm's motion for summary judgment, Mohr cites *State Farm Mut. Auto. Ins. Co. v. Davis*, 937 F.2d 1415 (9th Cir. 1991). There, the Court was asked to determine whether a highway shooting "resulted from the ownership, maintenance or use" of the assailant's automobile. *Id.* at 1416. The trial court granted summary judgment to State Farm, but the Ninth Circuit Court of Appeals reversed, concluding that "the shooting did result from the use of the vehicle." *Id.* at 1416-17.

In *Davis*, three Marines were transporting property, including several handguns, in the insured vehicle. While proceeding on the highway, the car was passed by a Corvette driven by Keukelaar. As the insured vehicle carrying the three Marines attempted to overtake and pass the Corvette, one of the Marines fired a .44 caliber revolver out the window, striking a passenger in the Keukelaar vehicle in the back of the head. State Farm brought an action in federal district court, seeking a declaration that it did not provide coverage to the Marines because the injuries were not "caused by an accident resulting from the ownership, maintenance or use" of the insured vehicle. *Id.* at 1417.

Initially, the Ninth Circuit concluded that the phrase "resulting from the use" and the phrase "arising out of the use" both require "a slight causal connection between an insured vehicle and a shooting injury." *Id.* at 1419. The Court recognized that coverage had been denied in other jurisdictions "where the vehicle merely provides a situs for the tort," but concluded that the Marines' use of the vehicle insured by State Farm "had more than a minimal causal connection with the incident" leading to the injuries. *Id.* at 1422. Accordingly, the Court remanded the case to the trial court for further action consistent with its opinion.

This Court believes that the facts in *Davis* are distinguishable from the facts here. In *Davis*, the insured vehicle was being used to overtake the vehicle in which the victim was riding. The operation of the vehicle was a necessary part of the Marines' tortious actions. In the instant action, however, Aaron's use of the pickup truck played no role in his tortious actions.

The Court finds instructive the South Carolina Supreme Court's analysis in *Peagler v. USAA Ins. Co.*, 628 S.E.2d 475 (S.C. 2006). There, the plaintiff's decedent was fatally injured when a shotgun accidentally discharged as her husband was attempting to remove it from a motor vehicle. The Court denied insurance coverage, finding that the injury did not arise out of the ownership, maintenance, or use of the motor vehicle.[10]

> A causal connection between the vehicle and the injury must exist in order for an injury to be covered by an automobile insurance policy. In this context, we have held that causal connection means: (a) the vehicle was an "active accessory" to the injury; (b) the vehicle was something less than the proximate cause but more than the mere site of the injury; and (c) the injury was foreseeably identifiable with the normal use of the vehicle. (citation omitted) "The required causal connection does not exist when the only connection between an injury and the insured vehicle's use is the fact that the injured person was an occupant of the vehicle when the shooting occurred."

*Id.* at 479. These views are consistent with those expressed by the Iowa Supreme Court in *Hollingsworth*. That is, while "arising out of" is a "more liberal concept of causation than 'proximate cause,'" it nonetheless requires "some causal relationship" between the injury and the covered risk. *Hollingsworth*, 553 N.W.2d at 595. That connection is not met if the vehicle is the mere situs of the accident. *Id.*

In the instant action, Aaron's pickup truck was simply the site where the unfortunate accident occurred. There is no evidence in the record that Aaron's use of the pickup truck contributed in any way to the accident. Mohr's shooting under these circumstances was unrelated to the inherent nature of the vehicle and not reasonably foreseeable within its normal use.

---

[10] A federal district court initially granted the plaintiff's motion for summary judgment, finding that coverage existed. On appeal, however, the Fourth Circuit Court of Appeals certified the question to the South Carolina Supreme Court. *See Peagler*, 628 S.E.2d at 477.

Even viewing the evidence in the light most favorable to Mohr, the Court concludes that there is no "causal relationship between injury and risk for which coverage is provided." *Hollingsworth*, 553 N.W.2d at 595. Instead, it is apparent that the motor vehicle was simply the site where this unfortunate accident occurred. Since Mohr's bodily injuries did not "arise out of" the use of the vehicle, there is no coverage provided by the insurance policy, and State Farm is entitled to summary judgment.[11]

### VI. ORDER

IT IS THEREFORE ORDERED as follows:

1. The Motion for Summary Judgment (docket number 18) filed on September 24, 2010 is **GRANTED**.

2. The Petition (docket number 2) filed by the Plaintiff is **DISMISSED**.

3. This case is **CLOSED**.

DATED this 29th day of November, 2010.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[11] State Farm also argues that by accepting payment from Aaron's homeowner policy, Mohr is "precluded" from asserting that the shooting arose out of the use of the motor vehicle. Since the Court has found as a matter of law that the shooting did not arise from the use of the motor vehicle, it need not address this additional argument.